All right. Good morning, Councilor. Good morning. Good morning, Judge. Good morning. It's Patrick v. Walmart. Yes, Your Honor. We'll first hear from Plaintiff's Counsel whenever you're ready. Thank you, Your Honor. May it please the Court, my name is Nelson Cameron and I'll represent Ms. Stacey Patrick. Ms. Patrick, a white female, became employed by Walmart in August 2014 as an to the receiving room for the third time in January 2016, and that's where they unloaded the trucks. She had two teams to supervise. Each team had a leader. One of those leaders was Jeremiah Elsie. He stayed in that area until March 2016. During that time, Ms. Patrick and Mr. Elsie wrote up several of the unloaders for use of the N-word, and they also used other sexual language. After Mr. Elsie left, Ms. Patrick had to choose two new team leaders. She had two candidates, a black female by the name of Latasha Plater and a black male by the name of Dominique O'Neal. Well, one day, the store manager, Tracy Broussard, a white female, and Chrissy Thomas, a black female, co-manager, and Ms. Patrick observed Mr. O'Neal throwing a temper tantrum, throwing boxes, using the N-word, saying and said something along the lines of, working just like slaves because we're blacks. Well, after that, Ms. Broussard informed Ms. Patrick not to train Mr. O'Neal anymore, and in May 2016, Ms. Patrick informed Mr. O'Neal and Ms. Plater would be promoted, and at that point, Mr. O'Neal became very irate, saying you just promoted a woman to a man's job. I'm going to get you two bitches in line. Excuse my language, words used became much more offensive. This is when the hostile work environment began. Words changed from just the simple N-word to bitch-ass, nigga, fat-ass, nigga, fat bitch, permutations of those same types of words, and also, it changed in quality, too, because there was some physical intimidation. Ms. Patrick took it as a threat that Mr. O'Neal said he would get you two bitches in line, but also, there were times when she told him to get to work that he would jump up quickly, ball up his fist, and walk towards her rapidly, then go to his work, and he also threw more temper tantrums, throwing boxes and things such as that. Then in June 2016, I think about June 22, 2016, he was rolled up for eating in the wrong area. He got into Ms. Patrick's face, yelling, screaming, spitting out his spit on her face, a very vile and disrespectful act, so much so she told him to leave, but he wouldn't, so she left the store, but Ms. Broussard required her to return, and when she did return, she asked to be transferred, so the work atmosphere there was permeated with the offensive conduct and statements that they were corroborated by. But you're leaving out that your client was using the M word in front of her black employees. Oh, we'll get to that. Admitted that when it was investigated, and so Walmart says they fired her for using that word, and so I don't know if you want to address that, the discrimination. Yeah, I was getting to it. I'm sorry. Maybe I was going a long way getting there. Okay, so Ms. Patrick was brought a racist discrimination case and discharged for a workplace rule violation. There are four elements that are upon the face of the case. The court, the trial court, indicated that the only one that was an issue is the fourth one, which says that the placement showed that she was treated less favorably than similarly situated employees outside of her class under nearly identical circumstances. The court found that a fact issue exists whether Ms. Patrick was treated more harshly than the unloaders in the use of the N word. It also reason why the trial court indicated that the circumstances weren't nearly identical is that Ms. Patrick was a white female manager using the N word in a conversation with black unloaders, and also the trial court indicated that it felt like that the use of the N word by a white manager was much more offensive than it would be for a black male hourly associate to use it. But these are differences without a distinction, and I believe if you look at, consider that Walmart has a policy against using slurs such as this, it has an anti-harassment discrimination policy, that it must enforce that policy equally or itself becomes a discriminator. What about the fact that the investigation into your client's use of the racial slur was confirmed, in fact admitted, and while there was information out there that some black employees were using the word, that was never substantiated from what I can tell. And wouldn't that make a difference? I mean, an employer can say, well, we've confirmed this, so we're going to fire this person. With these other folks, it's not so clear what happened. Well, and that's I think what the trial court said, if there was a fact issue on that, and that would be something for a jury to resolve. But it was a fact issue on whether the company heard reports that black employees were using the word, but I didn't think there was an investigation. Is there evidence that there was an investigation by Walmart that actually confirmed that the black employees were using it? No, there was never an investigation. There were multiple reports of it by supervisors and Tracy Broussard witnessed the use of the N-word by O'Neill when he threw that tantrum and she told Ms. Patrick not to train him anymore. And plus, later on in the case, when we filed a motion to reconsider, we had evidence from an admission by Broussard that she knew that the unloaders have been using the N-word. So I believe that's a fact issue for a jury to decide whether in fact there was hard evidence of the unloaders using it. I think that what the court, the trial court did was assume that that issue had been decided that there was in fact evidence that the unloaders used the N-word and that management knew about that. So if we look at some of the other case law here, yes, about the Lee versus KCS railway, some of the factors that that court used to find out to decide whether a situation was nearly identical was, was it the same decision maker? Yes, it was Broussard. Was it the same department? Yes, it was a receiving area. Was it during the same time frame? It was exactly the same time frame in that May to June 2016. Now, we're not saying that the unloaders should have been fired. We're only saying they should have been disciplined according to the written accountability guidelines so that the past disciplinary history of those involved is not nearly as important in this case as it would be in others. So what evidence is there for a jury to decide whether the circumstances were nearly identical? As you know, Lee versus KCS railway says the critical things to look at the plaintiff's conduct and the comparator's conduct. They're exactly the same, the use of the N-word not directed to a person. So things that a jury would be looking at first would be Walmart has a policy. I have it in the record excerpts. And that policy indicates in part that it does not tolerate any harassment, including slurs and intimidation in any aspect of its operations. And that would include managers, hourly employees, and it's a zero tolerance policy. Then, and that's a tab 14. It also states that we prohibit any form of harassment in all aspects of our business. This includes not limited to using slurs. Then at tab eight, your honors, we have the accountability guidelines. There are three accountability guidelines in that tab. The first accountability guideline provided to the plaintiffs by Walmart is listed as exhibit five. And you'll notice on that exhibit, there is no distinction between hourly associates and managers. There's one line that says slurs not directed to another, and there's a write-up that's required. That's a historical discipline. The other two guidelines came in later and were shown in exhibit Y that that applies to hourly employees. And it requires the historical aspect of this is that the discipline should be a second written determination. Then exhibit 32 applies to is shown under these accountability guidelines for the same conduct that the hourly employees engaged in and the manager engaged in. Then the next thing a jury could look at would be testimony. There's at tab 11, we have the testimony of Mr. Zuniga, who is the ethics and compliance manager. He advises the store manager and others as to what action to be taken would be appropriate. He testified that hourly and managers are treated the same in the use of the n-word. No one gets a free pass. He also testified that all associates hourly and manager adhere to the policy regarding the use of the n-word. Then at tab 15, we have the testimony of Ms. Sparkle, I believe it is, at tab 15, and she states when it comes to the n-word, associates, hourly associates and managers are treated the same. So we have these three general classifications of evidence that a jury could decide that circumstances were nearly identical. And it's not so much the issue is not whether the n-word from a white manager offends a black hourly associate more than when a black hourly associate or group of them uses it repeatedly over a long period of time. The issue is does the equally offend the Walmart policy and accountability guidelines, and that is true here. So we suggest to the court that the circumstances were nearly identical. There is substantial evidence from which a jury could decide that issue in favor of the plaintiff. The next claim that the plaintiff brought is one for hostile work environment that Walmart tolerated racially and sexually hostile work environment. The error the court made here, first error, is that it parsed out racial harassment and sexual harassment. On Kyle, the Supreme Court case, and many other cases indicate that in evaluating a hostile work environment claim, the totality of the circumstances must be considered. The Supreme Court stated, and I quote, the real social impact of workplace behavior often depends on the constellation of surrounding circumstances, expectations, and relationships, which are not fully captured by a simple recitation of the words used or the physical acts performed. What we have here is a kind of harassment claim, as I understand it, is based on the conduct and statements of the people she was supervising. And when a harassment claim is not against your supervisor, but against co-workers, or in this case, underlings, you have to have reported that to the company, and then the company basically doesn't do anything about it. Where did she report sexual and or racial harassment? I believe she did report it to Ms. Broussard. Ms. Broussard knew about it. And of course, this is not, and this is an important point, because the trial court did not base its decision on that, but I understand the court can base its decision on any aspect, but it was in fact reported up to chain of command. I know she complained that it was not a great environment back there, but where did she say it was a sexual harassment situation? I don't believe she ever used the words sexual harassment. I think what she complained about in general was the language or the lack of respect that was being given her. And I do believe she complained about the N-word being used up to chain of command to Thomas. And what is even more, I guess, persuasive is that one or two of these events happened in the presence of Chrissy Thomas. The time when he said, I'm going to get you two bitches in line, you're promoting a woman to do a man's job that took place in the presence of and in the office of Chrissy Thomas. That's the statement of Ms. Patrick. All right, counsel, your time's up. You'll get your five minutes for rebuttal. Oh, thank you. We'll next hear from defense counsel whenever you're ready, sir. Yes, thank you, Judge. Good morning. The material undisputed facts and issues in this case are really very straightforward and they're undisputed. A white Walmart manager was accused, a white female Walmart manager was accused by her black subordinates of using a racial slur that she admitted freely that she used inside and outside of work because she did not feel that it was an offensive slur. Based on her own admissions and the statements of several of the unloaders, the white store manager, the white market human resources manager and the Walmart global ethics investigator all determined that the complaint that the unloaders made against her was substantiated. They also determined that there was no substantiated use of the same slur by the unloaders, all of whom denied using it. Can I ask you a question about the unloaders and their use of it? I'm looking at page 1113 of the record on appeal and this is an excerpt of the deposition testimony of Lakeisha Baker, who I took it to be a fact witness or plaintiff, Ms. Patrick, and this is the transcript Question, did you ever see, did you see them and them there as the unloaders in the back? So did you ever see them, the unloaders, use this particular word when Tracy Broussard, the store manager, was there? Answer, yes sir. Question, in front of Tracy? Answer, walking out the front door, she didn't do nothing. I told you she'd have her own picks and chooses. That's the answer from this paper. Question, okay, how many times did you hear them, again, the unloaders, use this particular word in front of Tracy? Answer, they done used that particular word. These are, I'm excerpting a little bit, but you understand what I'm saying. They done used that particular word in front of Tracy numerous times and she, I just told you, she ain't going to say nothing because they were like her favorites. So if Ms. Broussard, there's clearly evidence in the summary judgment record that Ms. Broussard heard this particular word spoken by the on behalf of Walmart. Well, Ms. Baker is a disgruntled former employee who was gone before the events in this case occurred. But the judge assumed that Ms. Broussard or that management, he didn't identify specifically, but he assumed in his ruling that even though she testified, Sparkle Tims and Chrissy Thomas, who are both co-managers, the second highest people in the store, both black females, all denied that they had heard about it or that anybody had heard it, either the N word or the other inappropriate language. The judge just assumed though for purposes of his ruling that they've heard it. He based his ruling on the fact that the circumstances were not nearly identical between the alleged use of the word by the unloaders and the use of the word by the plaintiff. But you agree, I take it, we have the same standard. Walmart has the same standard regardless of whether this particular word is used by an unloader or a manager. I realize that they're slightly different policies, but in material part, they're identical, right? Well, there are different disciplinary guidelines in use for managers versus hourly people. Managers, of course, as you know, are held to a much higher standard of conduct. In this case, the management guidelines and the hourly guidelines for slurs used not directed towards someone, the appropriate discipline is second written to termination. So, regardless of who says the word, the only question is if they say the word. Well, it also depends on the circumstances that the word is used to, obviously. In this case, there was a formal complaint made by the unloaders that Ms. Patrick had used the word while there was no complaint by Ms. Patrick ever that the unloaders had used it. I know, and I guess what I'm struggling with, and I'm hoping you can help me, is I don't understand why it matters if Ms. Broussard, if there's some competent summary judgment evidence that Ms. Broussard, the store manager, is sitting there watching this happen, the word being used. I'm not sure I understand why it wouldn't matter if there was a complaint or an investigation or anything else. She saw it, allegedly. Well, of course, she testified and everyone else testified. LaKeisha Baker is the only one who testified about that. She wasn't in the receiving area. She was a deli associate. She is a disgruntled former associate who said all kinds of things that were not substantiated by anybody else and that were contradicted by everybody else. But understanding your point, that for purposes of a summary judgment record, there is one person out there saying, yes, Tracey Broussard heard this. She doesn't say when or in what context, but assuming that she did hear it, a manager is held to a much higher standard. A manager is not the same. Sorry? No, please go ahead. I'm sorry. Yeah. I mean, the case law is pretty clear that when you're making a disparate treatment claim that both people use this word, which violated company policy, then the issue is, were the circumstances nearly identical? The circumstances were not even close to nearly the higher standard. A manager is supposed to set an example. A manager, this is the way a manager is different than an hourly associate, an entry-level hourly associate. A manager is supposed to enforce the rules and the policies. A manager is subject to different and stricter disciplinary guidelines. They're supposed to lead. They're supposed to direct. They're supposed to And the only comparator, the only person that would be in a nearly identical situation would be another manager, not hourly entry-level employees. And that was one of the- I just want to make sure I understand, because there's an argument on pages 25 and 26 of your brief that it matters about the race of the speaker. So I'm wondering if you can help me with this hypothetical. Suppose that Ms. Broussard, she walks into the back of the and she hears two employees using this word, talking to each other. And suppose further that one of the employees is black and the other one is not. Could Ms. Broussard, in that circumstance, discipline them differently? No, I don't think so. No. And that's not what happened here. There was no- Well, no, the district court just identified that as one of the very many different differences that made this situation, that made these circumstances not nearly identical. The fact that it's supervisor versus hourly, according to the case law, is in itself good enough to show that they're not comparable. It's not nearly identical. But there were a number of circumstances that are in the record and that were pointed out by the court that show the differences between these two situations. Those are, one was a formal complaint of discrimination made by the unloaders. The other, it was an admitted violation, a substantiated violation regarding the use of the word. That only was to Ms. Patrick. She was the only one with an active second written coaching. A disciplinary record, in addition to having different responsibilities and duties, having a different disciplinary record also makes someone not nearly identical, not similarly situated. One of Ms. Patrick's principle arguments is that it's the very lack of a disciplinary record against other people using the word, that she says anyway, is probative of her claim. And so on this whole idea that the hour, I take your point, I think that you're a good legal authority for the idea that there's a difference between salary and management. But I'm looking now at the, this is the Zuniga deposition that's on page 1,088, record on appeal, page 75 of the transcript. The question is, it's important that all associates salaried or hourly adhere to a policy against using the word. And then he asks to repeat the question. He says, it's important that there are no exceptions, no free passes, no uses of this word, right? And then Mr. Zuniga says, that's correct. So if the standard is that everyone's supposed to be applying the same rules, I don't see, maybe legally Walmart could have taken a different position if they wanted to. But it sounds like Walmart has taken the position that, no, we treat the managers or the salaried folks, I'm sorry, the managers, the hourly folks the same. Is that not true? Well, both are expected to follow the rules and neither one is given a pass for using a slur like that. Of course, in this case, only one person was found to have used the slur, but assuming for purposes of this argument and assuming for purposes of the, of the court's decision below, they assumed, let's just say, as she claims, they were referring to regardless of race using this slur. It's a different, it's apples and oranges. It's the same word used, but it's used in very different circumstances. Also, there was, and that's really the thing. It's not even whether it's more offensive to a black person or a white person. The question is, is it different? And it's certainly different. It's yet another factor that distinguishes these two situations. And, again, there was no finding that anybody, any of the unloaders used the word. They all denied it. The only one that everybody agreed to use the word was Ms. Patrick. On that last point, I was a little confused by this record point. It sounded like Ms. Player, who I take it was one of, she was the CAP supervisor, that she, when the investigation first started, after Mr. Zuniga got involved and investigation starts, that there were acknowledgements that the unloaders were using this particular word. But then when Ms. Broussard went back to them a second time, then that's when they all denied it. Was it sort of a two-phase investigation or a misunderstanding? Well, in the statements that were taken in response to the unloaders' complaints, I don't believe Ms. Player, in her statement, indicated that anyone else had used the N-word except for Ms. Broussard. I mean, I'm sorry, Ms. Patrick. I don't think there was any indication that I'm aware of that anyone used the N-word other than Ms. Patrick saying, well, they all used it. And that is when Ms. Broussard said that. So the court correctly... Oh, I'm sorry, I'm sorry, I didn't... No, no, no. I'm sorry. It was my fault because it was taking me a second to put my hand on it. I don't actually have this in our record on appeal. I just have the district court's footnote. The district judge is citing the Broussard and the footnotes as Player, the CAP team leader, told Broussard that everyone in the back of the store used this particular word, but then the other employees refused to confirm the names of anyone who used that term. So that's the thing I was remembering. And I just wasn't sure, because I take your point. It sounds like when she went back to do the investigation and collected the statements, there was a uniform denial. But there is this thing from Player in addition to the deposition testimony under oath by Lakeisha Baker. Well, yeah. Okay. Again, it's this general, yeah, the word was used back there, but no one points to anybody. There has to be a comparator. This is just a vague, amorphous, the unloaders and somebody back there used the word or they heard the word. But there is absolutely no evidence anywhere that anyone other than Ms. Patrick actually used the word. There was nothing. I mean, when Walmart goes back and says, and interviews the unloaders, and they all say, no, no, we didn't use it. I mean, someone might say, yeah, I heard it back there and they did use it. But what is Walmart supposed to do when you go to the people who are complaining and they say, no, the only one who used it is Ms. Patrick? I think Walmart has a duty to take that seriously and to act on it. And in this case, Ms. Patrick still would not have been terminated, but for her second written, her coaching status, which was different than the other unloaders. And it's also very important to note that she, Ms. Patrick was previously, unlike the unloaders, previously warned about the way she spoke to her subordinates, previously warned that she needed to act as an example to her team. And that's why she was at that stage of the coaching process. But there was no one said, yes, I said it, or I heard so-and-so say it. And I think that's a significant difference here. And again, the only other real comparator would be, was there any other manager at the store who, a salaried member of management, who used the racial slurs and wasn't punished? And the answer is no. Ms. Patrick had no comparators. And the trial court could have ended its analysis with the finding that there's no prima facie case here. There is no disparate treatment based on the fact that there are not nearly identical circumstances. But the trial court went on, assumed that, yes, she established a prima facie case based on alleged disparate treatment. And then under the McDonnell-Douglas burden shifting, Walmart provided a legitimate business reason for the employment action. And the plaintiff has not attempted in any way and can't dispute the fact that, yes, it was an admitted use of this slur, violation of policy by a manager, and that's what happened. Instead of what the burden then moves to or shifts to the plaintiff to show, well, that's pretextual, and it's really a pretext for discriminatory treatment. But all the plaintiff does is say, well, I established a prima facie case based on the unloader supposedly using the word, and that's all I have to do. And that establishes pretext and my ultimate burden of proof. But there is nothing in the record to show that the reasons given for Ms. Patrick's termination were false or unworthy of belief. And there's absolutely zero evidence that there was any racial aspect to the termination. In fact, it was just the opposite, as the court noted. So just because you're running out of time, if you want to touch on the hostile work environment claim. Yes. The court summed it up, I think, beautifully by saying it seems in Congress to the court that a one who uses a certain term can find it offensive. And that is established by the fact that not only did Ms. Patrick admit that she didn't find any of that language offensive, but she was a manager. It was her job to prevent this language from being used. And she did not complain about it. Her only complaints related to insubordination and to the threats from Mr. O'Neill, which was based on him being angry at her for ratting him out and not promoting him. She claimed that she was offended, but at best, even in her affidavit, she said, what offended me was its use in the workplace. But she freely admitted that she used the language that she was complaining about. And also she disciplined. It's not like she was afraid to discipline the unloaders, because she disciplined O'Neill in June 2016. But she didn't discipline him for any racial or sexual language. And there's no indication in the record that he was ever disciplined for that by anyone. And also in terms of this sexual aspect of it or the racial aspect of it, O'Neill, every time he threatened Ms. Patrick, he threatened Player, too, allegedly. And Player is a black female. All right. We have your argument, counsel. And Mr. Cameron, you get your rebuttal. Yes, Your Honor. The statement that there's no record of Ms. Patrick writing up Mr. O'Neill for using racial language is incorrect. Mr. Elsey and she wrote him up several times in that January-March 2016 time period. Rebecca Williams wrote him up as well. That was put into the record. Ms. Williams, as a part of our motion for reconsideration, had indicated that she had written him up and saw those things before she left Walmart, but was not produced during the course of the litigation. As far as proof of pretext, there's a case law out there, Laxton v. Gap is one of many, that states a plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence. Once a disparate treatment is shown, the other form of pretext is not required. Now, Ms. Patrick used the N-word on the job at Walmart one day, three times. She said, nigga, nigga, nigga, I'm tired of hearing that word. And that's what she said to the unloaders to try to get them to behave correctly. And that's the way she used it. Now, we agree that a manager is held to a higher standard and that she should have been disciplined. But the case here is that she was treated less favorably than persons similarly situated outside of her class. The unloaders received no discipline. And Ms. Broussard witnessed twice Mr. O'Neill using the N-word, once when he sued DeFitt back in, I believe it was in March or May, sometime in that time frame. And she instructed Patrick not to train him anymore. And then we have Ms. Latasha Baker, who says that Ms. Broussard witnessed it for herself. Ms. Broussard knew that the unloaders used that word. She knew it when she group setting. She did not do as she did in the other investigation and set them down separately to ask them about using the N-word. Apparently that happened in January 2017. If you look in our record excerpts, we have several different statements written by unloaders. That's at tab nine, where they indicate, some indicate, yes, we've been using the N-word back there. We're still using the N-word. And this is what happens when a policy is not enforced effectively. So the fact that a manager is held to a higher standard is not the issue. The issue is holding all employees to some standard. There were unloaders who were held to no standard at all. And they were just allowed to do what they wanted to do. Let's see. So unloaders and managers under Walmart policy, and it's very important that the policy is what controls here. It's not, well, we think managers should be held to a higher standard, never mind the unloaders, no standard for them. But they have the same responsibility under the policy for both. This is not a case where we have a work rule violation of some job duty that's assigned to the cash register person. I'm going to ring up everything this way, that way. And then the manager has a separate kind of duty related to the cash register. No, this is a policy that applies to every employee. Are we done? Can you hear me? Okay, I heard something. So the policy is applied to every employee, whether you're a cash register attendant, whether you're the guy getting the buggies out in front of the store, or you're an employee. So there's inconsistent applications of policy. And certainly our case law says, you know, can be used to show pretext. But the comparator inquiry, what it's really saying is, should someone be able to infer a discriminatory motive based on different treatment of the same people? And so for there, I mean, these cases applying Lee, I don't know how the policy gets into that, because the question just as a legal matter, are these people so identical, the different treatment of this supervisor and these unloaders would allow a jury to find that there was this racial bias behind the decision? Do you know of any cases that use a policy or something like that in identifying the comparator, proper comparator? Well, I have looked for such cases, your honor. I can look again. If I find one, I'll certainly send that your way. But right now, I'm just not able to find anything like that. But looking at the concepts in the law that this is a universal kind of policy. It's not just a policy applies to certain people, applies to everybody. And it's the quality of the act that's at issue, a slur not directed to another. And that's the main thing we're looking at. As far as the her, Ms. Patrick not being offended by some of the language, we can look at some of the some other facts around surrounding this situation where she complained about these things, complained about to the unloaders, complained to her supervisors, her friends. So complaints can be a source of evidence to show offensive that the person felt offended by the conduct and by the language. And I believe that supports Ms. Patrick very well. All right, counsel, your time's up. But we have your argument as well as that from Walmart. Thanks to both sides for the helpful argument. And that wraps up this sitting of court. The court will be in recess and the lawyers may excuse themselves. Thank you, your honor.